## CIRCUIT COURT OF ROANOKE COUNTY

Sylvia M. Perez,
Executor of the Will of
Stanley Draskinis,
and individually

v.

Tatyana O. Draskinis et al.

April 25, 2014

Case No. CL13-1286

By Judge David B. Carson

This is a dispute over an approximately $5 million estate. The decedent, Stanley Draskinis, died testate on April 4, 2013, while he was divorcing his fourth wife, Defendant Tatyana Draskinis, to whom he had been married for approximately eight years. The divorce was never finalized, but Stanley disinherited Defendant under his will. Defendant has sought to exercise her statutory rights to take against the will.

Plaintiff Sylvia Perez is Stanley's daughter from his second marriage and the executrix of his estate. Relying on a premarital agreement ("the Agreement") that Stanley and Defendant allegedly entered into on July 1, 2005, Plaintiff asks me to determine that Defendant is not entitled to take against the estate or under Stanley's will.

The specific issue before me is the validity of the Agreement. Order of March 12, 2013. The parties agreed that this Court would determine all of the facts from the evidence without the intervention of a jury. I have done so and, as the fact-finder, have necessarily weighed the testimony of witnesses and considered their credibility.

Having heard the evidence *ore tenus* and considered the excellent written and oral arguments of counsel, I find and conclude that Plaintiff's Exhibits 9, 9A, and 21 are copies of the Agreement; Defendant Tatyana Draskinis and her late husband, Stanley Draskinis, entered into the Agreement on July

1, 2005; and the Agreement binds the parties and is enforceable against Defendant Tatyana Draskinis.

## Facts

Defendant Tatyana Draskinis, a native Ukrainian, is college educated and worked in the Soviet Union until its demise in the early 2000s. She immigrated to the United States in 2003 when she was fifty-four years old. She is a native Russian speaker and speaks little English. She was a widow in the Soviet Union and has an adult son, Eugene, and an adult daughter. Eugene immigrated to the United States at approximately the same time as Defendant. Defendant's daughter lives in Uzbekistan.

Stanley Draskinis and Defendant met in 2004 when Stanley was eighty-five years old. By October 2004, they were discussing marriage. At that time, Stanley showed Defendant a summary of his stocks worth approximately $3.5 million. Stanley told Defendant that she would have to sign a premarital agreement if they got married.

Eugene met Stanley at approximately the same time as his mother. He understood that Stanley wanted to marry his mother and further understood that Stanley was insistent on Defendant signing a premarital agreement as part of any marriage.

Defendant rejected several marriage proposals from Stanley, but eventually accepted his marriage proposal in May 2005. At that time, Defendant had overstayed her visa.

Ten to fifteen days before their wedding on July 11, 2005, Stanley gave Defendant a copy of the Agreement. Eugene agreed that he attempted to explain the Agreement to his mother. Like his mother, Eugene is a native Russian speaker, but, during this time period, he was admittedly conversant in English and did not require assistance reading or speaking English. He went over the Agreement with Defendant, summarizing the English text in Russian.

Stanley, a native Lithuanian who spoke Russian, also went over the Agreement with Defendant, explaining the terms to her in Russian. She understood that, as long as they were living together as husband and wife, she would get the house and $150,000 if Stanley had to leave the home because of advancing illness or upon his death. Stanley told Defendant that she could consult an attorney, but that she did not need to because he was going to take care of her. At that time, Stanley did not disclose any additional financial information to Defendant.

On July 1, 2005, Stanley and Defendant went to his attorney's office to sign the Agreement. Tonita Foster, Stanley's attorney, had arranged for a Russian translator to help Defendant understand the Agreement. Although the translator had no experience translating legal documents, she went over the Agreement with Defendant sentence by sentence, pausing occasionally

to refine her translation or look up words. Defendant asked the translator questions, and the translator did her best to answer them.

Defendant admittedly had only one legal question about the Agreement. The Agreement was very specific about which house Defendant would be entitled to, defining the house by street number. She asked Stanley's attorney what would happen if Defendant and Stanley moved from that specific house, but Ms. Foster would not answer the question. Defendant signed the Agreement, but she cannot remember if it was notarized or if she got a copy to take with her that day. She insists that she only signed a single copy of the Agreement.

Stanley and Defendant were married in Las Vegas on July 11, 2005. Defendant claims that, several weeks later, Stanley asked her for her copy of the Agreement, and she gave it to him. Stanley asked her to sign a new agreement, telling her that he had only made some small changes and she did not need an attorney or interpreter. Defendant signed this new agreement without reviewing it or consulting with anyone. This new agreement, according to Defendant, was not witnessed or notarized.

Two agreements have been produced in this litigation. Both are dated July 1, 2005, and the text is identical; the only differences between the two documents are some stray underlining and Defendant's signature. On one, Plaintiff's Exhibit 9, Defendant's last name is corrected where English letters are written over the Cyrillic letters Defendant originally transcribed. On the other, Plaintiff's Exhibit 21, Defendant's last name is written in unmarked English letters.

*Analysis*

Plaintiff asks. me to determine that Plaintiff's Exhibits 9, 9A, and 21 are in fact copies of the Agreement signed on July 1, 2005, and that the Agreement is valid and enforceable. Defendant contests that Exhibits 9, 9A, and 21 are copies of the Agreement she signed on July 1, 2005. Defendant alternatively argues that, even if I conclude that Plaintiff's Exhibits 9, 9A, and 21 are copies of the Agreement, it is still unenforceable.

It is Plaintiff's burden, by the preponderance of the evidence, to prove that Plaintiff's Exhibits 9, 9A, and 21 are in fact copies of the Agreement Stanley and Defendant signed on July 1, 2005. *Harriss, Magill & Co. v. John H. Rodgers & Co.*, 143 Va. 815, 820, 129 S.E. 513, 516 (1925). If Plaintiff carries her burden, then the burden shifts to Defendant to prove, by clear and convincing evidence, that the Agreement is unenforceable. *Rogers v. Yourshaw*, 18 Va. App. 816, 822, 448 S.E.2d 884, 887 (1994). Defendant attacks the Agreement's enforceability on three grounds. First, she argues that it is too ambiguous to be enforced. Second, she argues that she did not voluntarily enter into the Agreement. Finally, she contends that the Agreement is unconscionable and Stanley did not fully disclose his assets before she signed the Agreement.

A. *Plaintiff's Exhibits 9, 9A, and 21 Are Copies of the Agreement Stanley and Defendant Entered into on July 1, 2005*

Plaintiff's Exhibit 9 is a copy of the Agreement that Plaintiff received in the mail from Stanley in the summer of 2005. Presumably she received it sometime after her father's wedding to Defendant because she did not know that the couple was getting married. Stanley routinely sent Plaintiff and her half-brother, Joseph Draskinis, copies of his legal documents. Exhibit 9 is a copy of Plaintiff's Exhibit 9A, which is an original of Exhibit 9 that Plaintiff found in Stanley's safe-deposit box after his death. Exhibit 21 is substantively identical to Exhibits 9 and 9A. The only discernible differences are stray underlining and Defendant's "uncorrected" signature.

Defendant asserts that Exhibits 9, 9A, and 21 are frauds. She claims that, several weeks after they were married, Stanley came to her and told her that he had made a few small changes to the Agreement and she needed to sign a new agreement. He did not provide a translator or give her time to seek independent counsel. She claims she signed a single copy of the new agreement. After she signed it, she asserts that Stanley destroyed her copy of the first agreement. Thus, according to her, Exhibits 9, 9A, and 21 are copies of an agreement she signed *after* the marriage.

There are at least two significant facts that I must rebuttably presume are accurate because they are recited in the Agreement. Va. Code § 20-151(B). First, I must presume that the Agreement was signed on July 1, 2005, because that is when it is dated. Pl.'s Exs. 9, 9A, & 21. Second, I must presume that the Agreement was executed in duplicate. Pl.'s Exs. 9, 9A, & 21. In light of these presumptions (which I conclude Defendant has not rebutted), and in conjunction with certain logical and evidentiary inconsistencies in Defendant's story, I find that Exhibits 9, 9A, and 21 are copies of the Agreement signed on July 1, 2005, and not copies of a second agreement.

I see a material logical conflict in Defendant's story. She claims that she only signed one copy of the Agreement on each occasion: one on July 1, 2005, and one on some unspecified date after the marriage. According to her, she made a mistake when she signed the second agreement, first signing her last name in Cyrillic letters and then writing over the Cyrillic with English letters. She claims that she pointed this out to Stanley, but that he told her not to worry. Even though she now claims that Stanley was taking advantage of her by forging the Agreement, she admits that Stanley gave her Plaintiff's Exhibit 21, a copy with a clean signature. If Stanley was orchestrating a ruse, I cannot understand why Stanley would give her Exhibit 21 with a clean signature, mail Exhibit 9 with the marked-up signature, and keep Exhibit 9A, also with the marked-up signature, in his safe-deposit box.

The following evidentiary inconsistencies also concern me.

1. Prior to Stanley's death and subsequent to some marital difficulties with Stanley, Defendant admits that an attorney told her the Agreement

dramatically affected her marital rights, but Defendant admittedly did not raise any concerns with anyone about the authenticity of the Agreement until *after* Stanley's death.

2. Defendant's son, Eugene, insists that he was present with Defendant when Stanley presented her with the alleged second agreement within weeks of their marriage, but Eugene did not raise any concerns about this obviously suspicious activity.

3. Prior to his death, Defendant brought Exhibit 21 with her to two different law firms, but Defendant admittedly never told either firm that it was fraudulent.

4. Defendant points to mislabeled paragraphs in the Agreement as evidence that it was manipulated, but Eugene admitted that Stanley did not have the computer skills needed to manipulate the Agreement.

Notwithstanding the Plaintiff's protestations, I do not believe that Plaintiff's Exhibits 9, 9A, and 21 are forgeries made to look like the Agreement dated July 1, 2005. Instead, I believe that, consistent with the Agreement's recitals—Defendant signed two copies of the Agreement on July 1, 2005. On one copy she made a mistake while signing. Stanley took that copy (Exhibit 9A), made a copy of it that he mailed to Plaintiff (Exhibit 9), and locked the original (Exhibit 9A) in his safe-deposit box. Defendant took the second copy of the Agreement (Exhibit 21) home with her.

Accordingly, I conclude that Plaintiff has carried her burden of proving that Plaintiff's Exhibits 9, 9A, and 21 are in fact copies of the Agreement Stanley and Defendant signed on July 1, 2005.

## B. *The Agreement Is Enforceable*

### 1. *The Agreement Is Unambiguous*

Defendant argues that the Agreement is too ambiguous to be enforced. Her complaints focus on paragraphs 2(F) and 2(G1). There are two subsections (G) in paragraph 2. To keep things straight, I refer to the subsection (G) beginning on page 2 as subsection (G1). The subsection (G) beginning on page 3 is (G2).

Premarital agreements are enforced and interpreted like all other contracts. *Smith v. Smith*, 43 Va. App. 279, 287, 597 S.E.2d 250, 254 (2004). Virginia courts resolve contractual vagaries in one of three ways. First, "if no patent or latent ambiguities exist, a court should enforce the plain meaning of the contractual language without resort to extrinsic evidence." *Id.* at 288, 597 S.E.2d 254. Second, "if an ambiguity exists, a "court should still enforce the contract if the real meaning of the ambiguous provision can be discerned from extrinsic evidence." *Id.* Finally, "if an ambiguity renders the alleged agreement too indefinite, even after the consideration of extrinsic evidence, for the court to determine the parties' intent, the contract

cannot be enforced due to the absence of any discernible meeting of the minds." *Id.*

Defendant argues that paragraph 2(F) is susceptible to three interpretations: (1) Defendant gets the house and its contents; (2) Defendant gets the house and its contents plus $150,000; or (3) Defendant gets the assessed value of the house plus $150,000. When given its plain meaning, however, I find that paragraph 2(F) is unambiguous.

Paragraph 2(F) states:

> Should the husband become physically and/or mentally disabled and have to be permanently removed from the marital residence, such move to be determined necessary by the Husband's daughter, Sylvia, and the Wife be determined not to be at fault, the Husband and Wife agree that, at his death, the Wife shall have sole right and title to his real property located at 2751 Hillbrook Drive, Roanoke [County], Virginia, and all furnishings therein, or in lieu thereof, the Wife shall receive a cash sum equal to the assessed value of said real property plus the sum of One Hundred and Fifty Thousand Dollars ($150,000.00); the Wife will receive no other spousal support or real or personal (tangible or intangible property) and this shall be a final award.

Pl.'s Exs. 9, 9A, & 21, ¶ 2(F).

Although less than clear because it tries to do too much in a single sentence, paragraph 2(F) unambiguously provides Defendant (1) the house and $150,000, or (2) the house's assessed value and $150,000. The double use of "sum" leads me to conclude that "or in lieu thereof, the Wife shall receive a cash sum equal to the assessed value of said real property" should be read as a parenthetical; it provides Defendant the option to claim either the house or its value. Clearly, two different cash sums are contemplated. Defendant gets the house plus the sum of $150,000, or Defendant gets a cash sum equal to the assessed value of the house plus the sum of $150,000. If Defendant was only supposed to get the extra $150,000 if she opted to take the property's assessed value, the sentence would not use the second "sum." It would instead read "or, in lieu thereof, the Wife shall receive a cash sum equal to the assessed value of said real property plus $150,000." This interpretation is consistent with the evidence at trial.

Defendant attacks paragraph 2(G1) on the same grounds. My conclusion, however, is the same, paragraph 2(G1) is unambiguous.

Paragraph 2(G1) states:

> In the event of the Husband's death and the parties are still living together and/or no divorce has been filed, the Wife

shall receive sole right and title to th[e] Husband's real estate located at 2571 Hillbrook Drive, Roanoke [County], Virginia, and all furnishings therein or in lieu thereof, the Wife shall receive cash sum equal to the accessed (sic) value of said property plus the sum of One Hundred and Fifty Thousand Dollars ($150,000.00) and she waives any right she would have as a spouse to claim an elective share of the Husband's estate, and shall accept this as full and final settlement [sic] she has against the Husband's estate . . . . [sic]

Pl.'s Exs. 9, 9A, & 21, ¶ 2(G1).

Here, "and/or" means "or." Bryan A. Garner, *Garner's Modern American Usage*, 45 (3d ed. 2009). Paragraphs 2(C) and 2(D) determine Defendant's rights if she or Stanley files for divorce. Paragraphs 2(E) and 2(F) determine her rights if she or Stanley leaves the marital home. Paragraph 2(G1) simply defines her rights if Paragraphs 2(C) through 2(F) are not triggered by a divorce filing or physical separation.

Paragraph 2(G1)'s concluding clause, "and shall accept this as full and final settlement she has against the Husband's estate," is incomplete and does not mean anything. It is not ambiguous because it cannot reasonably be given any interpretation. *Hill v. State Farm Mut. Auto. Ins. Co.*, 237 Va. 148, 153, 375 S.E.2d 727, 730 (1989). It is simply surplusage that means nothing, and I will not read anything into it. This surplusage, however, does not render the entire agreement unenforceable; it is simply ignored. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, 176–77 (2012) (noting that the surplusage canon does not always apply because occasionally, but rarely, words in a legal document have no meaning).

Ultimately, I conclude that paragraph 2(G1) should be read like paragraph 2(F). Specifically, if it applies, Defendant gets either (1) the house and $150,000 or (2) the assessed value of the house and $150,000. Again, this interpretation is consistent with the evidence at trial.

### 2. Defendant Voluntarily Signed the Agreement

A premarital agreement is unenforceable if the party opposing its enforcement did not voluntarily bind herself to the agreement. Va. Code § 20-151(A)(1). Defendant argues that she did not voluntarily agree to be bound by the Agreement.

Voluntariness "is a question of fact to be determined from the totality of all the circumstances." *Chaplain v. Chaplain*, 2011 Va. App. LEXIS 15, at *14–15 (2011) (unpublished) (citations and internal quotations omitted). Voluntary connotes "unconstrained by interference; unimpelled by another's influence; [and]... resulting from free choice." *Id.* at *15 (citations and

internal quotations and brackets omitted). Thus, an action taken under "coercion or duress or without capacity or knowledge of essential facts is not voluntary." *Id.* (citations and internal quotations omitted).

Factors relevant to assessing whether a prospective spouse's execution of a premarital agreement was voluntary include:

1. The coercion that may arise from the proximity of the execution of the agreement to the wedding or from surprise in the presentation of the agreement;

2. The presence or absence of independent counsel or of an opportunity to consult independent counsel;

3. Inequality of bargaining power, in some cases indicated by the relative age and sophistication of the parties; whether there was full disclosure of assets; and

4. The parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement. *Id.* at *15–16 (citations omitted).

I have considered the evidence and the above factors. I find that Defendant voluntarily signed the Agreement. Defendant was aware that a premarital agreement would be forthcoming, and Stanley gave Defendant the Agreement well before they signed it. Nothing suggests she was unduly coerced, prevented from seeking independent counsel, or unaware that she was waiving rights she might otherwise have had when she signed the Agreement.

### 3. *The Agreement Is Not Unconscionable and Stanley Fairly and Reasonably Disclosed His Assets*

Under Va. Code § 20-151(A)(2), a premarital agreement is unenforceable if (1) the agreement is unconscionable and (2) the challenging party did not receive "fair and reasonable" disclosure of the other party's financial information. Defendant argues the Agreement is unconscionable and that Stanley did not fairly and reasonably disclose his assets.

### a. *The Agreement Is Not Unconscionable*

To prove unconscionability, Defendant must establish "(1) a gross disparity existed in the division of assets and (2) overreaching or oppressive influences." *Galloway v. Galloway*, 47 Va. App. 83, 92, 622 S.E.2d 267, 271 (2005). I "must view the apparent inequity in light of other attendant circumstances to determine whether the agreement is unconscionable and should be declared invalid." *Id.* I must also assess unconscionability at the time of contracting; an agreement is not unconscionable simply because "subsequent history discloses that the contractual provisions are ill-reasoned or ill-advised." *Rogers*, 18 Va. App. at 820, 448 S.E.2d at 886 (citations and internal quotations omitted).

Defendant has not established a gross disparity in the division of assets. Although Stanley was a wealthy man, he accumulated his wealth before marrying Defendant. He inherited much of this wealth from Plaintiff's mother. Had Stanley and Defendant divorced, his separate premarital assets would have been beyond the reach of the Court's equitable-distribution powers. Va. Code § 20-107.3(C). Stanley simply wanted to keep his separate premarital property separate, and it was not unconscionable for him to do so.

### b. *Stanley Fairly and Reasonably Disclosed His Assets*

Defendant also alleges that Stanley failed to fully disclose his premarital assets. Parties to a marital agreement, however, are only entitled to "fair and reasonable" disclosure of premarital assets. Va. Code § 20-151(A) (2) (requiring only "fair and reasonable" disclosure); *see also Makoui v. Makoui*, 2011 Va. App. LEXIS 360, at *3–4 (2011) (unpublished) (noting that Va. Code § 20-151(A)(2) only requires "fair and reasonable" disclosure).

It is undisputed that, in October 2004, Stanley showed Defendant his stock holdings. At that time, the stocks were worth about $3.5 million. Most of his wealth was in these stocks, although Stanley also owned the marital home, personal property, and had a checking account.

Stanley disclosed the wealth he held in stocks. In addition, Defendant was well aware that Stanley owned the marital home and the personal property within it. There is no evidence that Stanley hid other personal property of significant value from Defendant. Although Defendant was unaware of the balance of Stanley's checking account, there is no evidence before the Court that Stanley held a significant amount of cash in deposit or checking accounts in July 2005.

Because Defendant was aware of the majority of Stanley's wealth, I find that Stanley fairly and reasonably disclosed his wealth before Defendant signed the agreement.

### Conclusion

The sole issue before me is the validity of the Agreement. For the reasons stated above, I conclude that Plaintiff's Exhibits 9, 9A, and 21 are copies of the Agreement; Defendant Tatyana Draskinis and her late husband, Stanley Draskinis, entered into the Agreement on July 1, 2005; and the Agreement binds the parties and is enforceable against Defendant Tatyana Draskinis.